James **DECKER**, Plaintiff-Appellant,

v.

Patricia Roberts **HARRIS**, Secretary of Health and Human Services, Defendant-Appellee.

No. 758, Docket 80–6172.

United States Court of Appeals, Second Circuit.

Argued Feb. 23, 1981.

Decided April 10, 1981.

Deborah LaBelle, Monroe County Legal Assistance Corp., Geneva, N. Y., for plaintiff-appellant.

Gerald J. Houlihan, Rochester, N. Y., Asst. U. S. Atty., for the Western District of New York (Richard J. Arcara, U. S. Atty., for the Western District of New York, David Rothenberg, Asst. U. S. Atty., Rochester, N. Y., Frank V. Smith III, Regional Atty., Michael H. Noorigian, Asst. Regional Atty., Dept. of Health and Human Services, New York City, of counsel), for defendant-appellee.

Before FEINBERG, Chief Judge, OAKES, Circuit Judge, and NEAHER, District Judge.*

FEINBERG, Chief Judge:

James Decker appeals from a judgment of the United States District Court for the Western District of New York, Harold P. Burke, J., affirming a decision of the Secretary of Health and Human Services that denied Decker's application for social security disability benefits. We find that the record on which the Secretary's determination rests, including the decision of the administration law judge who heard the claim, is inadequate in critical respects and accordingly remand for further proceedings.

---

* Honorable Edward R. Neaher, Judge of the United States District Court for the Eastern District of New York, sitting by designation.

## I

Appellant, who is now fifty years old, filed an application in February 1978 for disability insurance benefits under Title II of the Social Security Act and for Supplemental Security Income (SSI) disability benefits under Title XVI of the Act. The application was initially reviewed by the Bureau of Disability Determinations (BDD), an agency of New York State under contract to the Social Security Administration.[1] The BDD in turn arranged for a medical examination of appellant by Dr. R. William Brand, a Board-certified internist. As a result of his examination, Dr. Brand concluded that appellant suffered from chronic asthmatic bronchitis, chronic nasal congestion, and probable early emphysema. Based on a pulmonary examination, Dr. Brand predicted that dyspnea (shortness of breath) would result from the exertion required for ascending "[a] flight of stairs, carrying groceries, [or] any kind of hurrying." The pulmonary function test revealed "severe airways obstruction with partial reversibility after inhaled bronchodilator. Compatible with chronic bronchitis with superimposed bronchospastic components."

The BDD also had before it a report from appellant's physician, Dr. Vincas Sirmenis, who had been treating him since June 1977. Dr. Sirmenis diagnosed appellant's illness as pulmonary fibrosis, emphysema, and bronchial asthma, with associated "mental apprehension when in respiratory trouble." His report was essentially conclusory, however, lacking detailed discussion or evaluation of the scope of appellant's disability. It also reported a "fair" response to treatment by a variety of medications.

On the basis of these two medical reports, the BDD concluded that appellant had failed to establish the requisite period of disability. The Bureau's examiner gave the following "rationale" for the adverse decision:

---

1. For a description of the functions of the BDD and its relation to the Administration, see *Ellis v. Blum*, 643 F.2d 68, 70–71 (2d Cir. 1981). See also 20 C.F.R. § 404.1520(a) (1980).

Medical evidence shows this claimant to have chronic asthmatic bronchitis, and probable early emphysema. Breathing tests performed April 1978 indicated that the claimant has the capacity to perform light work, but not medium or heavy work. The claimant is a young worker whose past customary work was as a laborer, carpentry, which was heavy work. Although this claimant cannot perform his past customary work, the claimant would be able to do sedentary and light work such as: soldering machine operator, 706.887; tester, eclectronic [sic] components, 726.687; or cable worker, 739.-687. These jobs and similar jobs exist in the national economy in significant numbers, therefore, this claim is denied.

Presumably acting on the basis of the BDD report, the Administration notified appellant in May 1978 that he had been found not entitled to disability benefits. After appellant's requests for reconsideration were denied, he asked for a hearing before an administrative law judge (ALJ); this was held in December 1978.

During the hearing, at which appellant was represented by counsel, appellant testified that he had left school after the seventh grade, served in the Army for four years (1948–52), and worked thereafter principally as a laborer and carpenter. He said he had stopped working in 1976 as the result of worsening problems caused by asthma and emphysema. He had difficulty walking long distances or lifting weights for more than five minutes, and while he was able to help his wife with household tasks and to drive his car on local trips, his breathing problems had compelled him to give up his hobbies of hunting and fishing.

In addition to Decker's testimony, the ALJ considered the reports from Drs. Sirmenis and Brand and the BDD determination based on them. Dr. Sirmenis also submitted, immediately prior to the hearing, another report "certifying" that Decker had been disabled since June 7, 1977, from any substantial gainful work, and that he would continue to be disabled for at least a year. Finally, Decker submitted a handwritten report from a Veterans Administration officer, dated October 27, 1978, stating that he had been rated "permanently and totally disabled for VA pension purposes from 7/14/78."

In January 1979, the ALJ concluded that Decker had "a mild to moderate obstructive pulmonary disease for which he has not been hospitalized and which has not resulted in any substantial restrictions in his ability to work in a sedentary job or engage in routine daily activities." Finding that Decker had "the residual functional capacity to engage in sedentary and light work," the ALJ concluded that Decker was capable of working "as a tester of electronic components, cable worker, or a soldering machine operator"—the occupations identified by the BDD—and took administrative notice of the existence of these jobs "in substantial numbers in the regional economy." Therefore, the ALJ concluded, Decker was not disabled within the meaning of either Title II or Title XVI and thus not entitled to disability benefits.

Decker's request for review by the Administration's Appeals Council was denied in June 1979, making the ALJ's decision the final determination of the Secretary in this case. Decker subsequently brought this action for review, pursuant to 42 U.S.C. §§ 405(g), 1353(c)(3), in federal district court. Acting on cross-motions for summary judgment, the district judge affirmed the Secretary's determination in June 1980, finding that the denial of benefits was reasonable and supported by substantial evidence. This appeal followed.

## II

We start by recognizing the basic principle that the burden of proving disability rests on the person claiming disability benefits, a principle established by statute, see 42 U.S.C. § 423(d)(5), regulation, see 20 C.F.R. § 404.1502 (1980), and case law, see, e. g., *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980). In this case, there is no serious dispute that appellant met his initial burden of proof by making a prima facie showing of physical impairment sufficiently severe

to preclude his return to his prior employment as a laborer or carpenter. The report of the BDD expressly found that "this claimant cannot perform his past customary work." The ALJ was less specific, stating only obliquely that "[t]he fact that the claimant may be precluded from returning to his past employment is not determinative" in evaluating a disability claim. In any event, we are persuaded that any contrary conclusion—that Decker was capable of resuming work as a laborer or carpenter—would be without support in the record.

■ After a claimant has made this initial showing, "the burden shifts to the Secretary, who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his physical capability, but as well his age, his education, his experience and his training." *Parker v. Harris*, supra, 626 F.2d at 231. The showing required of the Secretary has two principal components. See *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976). First, the Secretary must show that the claimant's impairment is of a kind that still permits certain types of activity, such as lifting or walking, necessary for other occupations, and that the claimant's experience involves skills transferable to other work. Second, the Secretary must present evidence showing the existence of specific types of jobs, available in the national economy, suitable for a claimant with these capabilities and skills. See, e. g., *Bastien v. Califano*, 572 F.2d 908, 912–13 (2d Cir. 1978). In an attempt to attain greater consistency in decisions on both of these issues, the Social Security Administration has promulgated a set of detailed regulations, codi-

fied at 20 C.F.R. Subpart P, §§ 404.1501–1539 and Apps. 1 & 2 (1980).[2] See generally *Vega v. Harris*, 636 F.2d 900, 903–904 (2d Cir. 1981) (per curiam); Goldhammer, The Effect of New Vocational Regulations on Social Security and Supplemental Security Income Disability Claims, 32 Ad.L.Rev. 501 (1980).

## A. Decker's "Residual Functional Capacity."

The Administration's new regulations approach the first element of the Secretary's showing as a question of determining "residual functional capacity," measured primarily, insofar as physical impairments are concerned, in terms of strength and exertional capabilities. Id. § 404.1505(b). Exertional capabilities in turn are defined in terms of ability to perform "sedentary," "light," "medium," "heavy," and "very heavy" work. Id. § 404.1510. For example, the regulations define "sedentary" and "light" work as follows:

(b) *Sedentary work*. Sedentary work entails lifting 10 pounds maximum and occasionally lifting or carrying such articles as dockets (e. g., files), ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(c) *Light work*. Light work entails lifting 20 pounds maximum with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be only a negligible amount, a job is in this category when it requires walking or standing to a signifi-

---

**2.** These regulations govern determinations of entitlement to disability insurance benefits under Title II of the Social Security Act. Parallel regulations governing claims for SSI benefits under Title XVI appear at 20 C.F.R. Part 416, Subpart I, §§ 416.901–.985 and Apps. 1 & 2. The regulations relevant to appellant's claims are substantively the same in both contexts; for convenience, we refer only to the Title II regulations.

These regulations were promulgated in November 1978, prior to the ALJ's decision, though they became effective in February 1979, after his decision. It is settled, however, "that the regulations apply to pending suits seeking judicial review of administrative determinations made prior to that effective date." *Vega v. Harris*, 636 F.2d 900, 902–903 (2d Cir. 1981). See also *Hicks v. Califano*, 600 F.2d 1048, 1050 (4th Cir. 1979).

cant degree, or when it involves sitting most of the time with a degree of pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, an individual must be capable of performing substantially all of the foregoing activities. The functional capacity to perform light work includes the functional capacity to perform sedentary work.

Id. § 404.1510(b)–(c).

■ In light of these definitions, we do not believe the record supports the ALJ's conclusion that appellant has a residual capacity to perform "light" work. Decker's own testimony was that he could lift "up to 10 or 15 pounds" for "maybe 5—for a few minutes, you know, but I mean I couldn't keep doing it." He testified as well that "if I try walking far, I—you know, I just got to stop and rest." The record contains little beyond this with respect to Decker's exertional abilities, other than the BDD's conclusory interpretation of the April 1978 breathing tests. Of course, Decker's potentially self-serving statements need not be given conclusive effect, but on this record there is neither any evidence to the contrary nor any indication by the ALJ that he discredited Decker's testimony. The record does, however, support the ALJ's finding that Decker is capable of "sedentary" work.

B. *Decker's Skill Level.*

■ Neither the BDD nor the ALJ made any explicit finding with respect to the skills required by appellant's prior work experience, even though this is, under the regulations, a basic element in determining whether suitable alternative work exists in the national economy. See id. §§ 404.1508, 404.1511. The regulations categorize an applicant's work experience as "unskilled," "semi-skilled," or "skilled," setting out a definition in each instance. The two terms of particular concern in this case are defined as follows:

(b) *Unskilled work.* Unskilled work denotes work which requires little or no judgment in the performance of simple duties that can be learned on the job in a short period of time. Considerable strength may or may not be required. As an example, where the primary work function of occupations consists of handling, feeding and off-bearing (i. e., placing or removing materials from machines which are automatic or operated by others), or machine tending, and average successful job performance can ordinarily be achieved within 30 days, such occupations are considered unskilled. Other types of jobs requiring little specific vocational preparation and little judgment are likewise unskilled. No acquired work skills can be attributed to individuals who have performed only unskilled work.

(c) *Semi-skilled work.* Semi-skilled work denotes work in which some skills are involved but the more complex work functions are not required. Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise detecting irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities involving work functions of similar complexity. A job may be classified as semi-skilled where coordination and dexterity are necessary as in the use of the hands or feet for the rapid performance of repetitive tasks.

Id. § 404.1511(b)–(c).

Here, the record indicates that Decker received no specialized training during his four years in the Army, and that he spent the bulk of his civilian working career as a carpenter engaged in "rough construction," putting up and tearing down forms for poured concrete. He had no formal training as a carpenter, learning his work on the job. He also worked as a laborer in a paper mill and as a sander and painter in an automobile body shop for several years. This record suggests that Decker's experience has been limited to what the regulations characterize as "unskilled" work. However, we leave this determination to be made on remand after any supplementation of the record found to be advisable to permit an appropriate finding. If it should be

determined that Decker's experience has rendered him "semi-skilled," it will be further necessary, in accordance with the regulations, to ascertain whether or not the skills acquired are "transferable," see id. § 404.1511(e), since, as indicated below, this also has a bearing on the determination of alternative available employment.

## C. Alternative Employment in the National Economy.

The importance of the inquiries into exertional capabilities and acquired skills becomes clear when we turn to the second component of the Secretary's burden: showing the availability of suitable alternative employment in the national economy. To facilitate this task, the Administration has developed a set of "medical-vocational guidelines" set out at Appendix 2 of 20 C.F.R. Subpart P. These guidelines provide "rules" for determining whether a claimant of a given age, educational level, and skill experience is "disabled" or "not disabled" under the Act. The rules are meant to

reflect the analysis of the various vocational factors (i. e., age, education, and work experience) in combination with the individual's residual functional capacity (used to determine his or her maximum sustained work capability for sedentary, light, medium, heavy, or very heavy work) in evaluating the individual's ability to engage in substantial gainful activity in other than his or her vocationally relevant past work.

Id. App. 2, § 200.00(a). The rules seek to promote uniformity of decision-making by mandating certain conclusions—that a claimant is "disabled" or "not disabled"—if specified sets of findings are made. As the regulations explain:

Where the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled. However, each of these findings of fact is subject to rebuttal and the individual may present evidence to refute such findings. Where any one of the findings of fact does not coincide with the corresponding criterion of a rule, the rule does not apply in that particular case and, accordingly, does not direct a conclusion of disabled or not disabled.

Id. Separate sets of rules are set out for varying degrees of disability; one set applies to persons limited by a medically determinable impairment to "sedentary" work, see Table No. 1, another to persons limited to "light" work, see Table No. 2, and the third to persons residually capable of "medium" work, see Table No. 3.

Since we have concluded that the record sustains a finding that Decker is capable only of "sedentary" work, the rules of particular interest in this case are those set out at Table No. 1. The specific rules that may bear on Decker's claim are reproduced below:

| Rule | Age | Education | Previous work experience | Decision |
|---|---|---|---|---|
| | | . . . . . | | |
| 201.09 | Closely approaching advanced age. | Limited or less. | Unskilled or none. | Disabled. |
| 201.10 | [ditto] | [ditto] | Skilled or semiskilled— skills not transferable. | [ditto] |
| 201.11 | [ditto] | [ditto] | Skilled or semiskilled— skills transferable. | Not disabled. |
| | | . . . . . | | |

| Rule | Age | Education | Previous work experience | Decision |
|------|-----|-----------|--------------------------|----------|
| 201.17 | Younger individual age 45–49 | Illiterate or unable to communicate in English. | Unskilled or none. | Disabled. |
| 202.18 | [ditto] | Limited or less—at least literate and able to communicate in English. | [ditto] | Not disabled. |
| 201.19 | [ditto] | [ditto] | Skilled or semiskilled—skills not transferable. | [ditto] |
| 201.20 | [ditto] | [ditto] | Skilled or semiskilled—skills transferable. | [ditto] |

. . . . .

The term "closely approaching advanced age" is defined in the regulations as covering ages 50 to 54. Id. § 404.1506(c). A person is deemed to have a "limited" education, absent evidence to the contrary, if he has completed at least the seventh but no more than the eleventh grade. Id. § 404.-1507(d).

The "decision" directed for each combination of factors rests in part on administrative notice of "reliable job information." See id. § 404.1509(c). As explained in the introductory material to the rules:

> The existence of jobs in the national economy is reflected in the "Decisions" shown in the rules; i.e., in promulgating the rules, administrative notice has been taken of the numbers of unskilled jobs that exist throughout the national economy at the various functional levels (sedentary, light, medium, heavy, and very heavy) as supported by the "Dictionary of Occupational Titles" and the "Occupational Outlook Handbook," published by the Department of Labor; the "County Business Patterns" and "Census Surveys" published by the Bureau of the Census; and occupational surveys of light and sedentary jobs prepared for the Social Security Administration by various State employment agencies.

20 C.F.R. Subpart P, App. 2, § 200.00(b). Thus, whenever a particular rule is found applicable to the facts of a claim, it is unnecessary for the Secretary to identify specific alternative jobs for that particular claimant; the existence of such jobs has been "noticed" in the regulatory drafting process.

Strictly interpreted, the rules take administrative notice only of the "existence" of alternative jobs; they do not, in so many words, purport to override the need for a particularized showing in each case of the suitability of alternative jobs in the light of the claimant's age, residual capacity, experience, and skills. Cf. *Taylor v. Weinberger*, 512 F.2d 664, 668 (4th Cir. 1975) ("[W]hile ... the Secretary may administratively notice the *existence* of [specified] jobs in the economy, facts pertaining to the capacity of a specific individual can be supplied only by particularized proof." (Emphasis in original.)). As a practical matter, however, the two inquiries are difficult to separate: when the rules assert that jobs exist for persons having a particular set of characteristics they are necessarily asserting that these jobs are "suitable" without any need for an individual showing of suitability.

This aspect of the rules raises a question of consistency with established case law

governing the determination of available alternative employment. Once a claimant's residual functional capacity and skill level have been ascertained, this court and others have generally required that the Secretary identify *specific* alternative occupations available in the national economy that would be suitable for the claimant. The cases have also insisted that these jobs be supported by "a job description clarifying the nature of the job, [and] demonstrating that the job does not require" exertion or skills not possessed by the claimant. *Bastien v. Califano,* supra, 572 F.2d at 912–13. This requirement of specificity has two principal purposes. First, it assures the claimant of adequate notice of the grounds on which his claim may be denied, providing him with an opportunity to present rebuttal evidence. See generally 3 K. Davis, Administrative Law Treatise § 15.18, at 198–206 (2d ed. 1980). Second, it helps to create a satisfactory administrative record for judicial review, enabling the courts to determine more readily whether the Secretary's decision rests on "substantial evidence." Cf. *O'Banner v. Secretary of HEW,* 587 F.2d 321, 323 (6th Cir. 1978).

To establish the availability of suitable alternative jobs, courts have traditionally preferred the procedure of calling a vocational expert to testify at the administrative hearing. See, e. g., *Hicks v. Califano,* 600 F.2d 1048, 1050 (4th Cir. 1979); *Kenny v. Weinberger,* 417 F.Supp. 393, 399 (E.D.N.Y.1976). However, judicial decisions have stopped short of establishing a per se rule requiring such testimony, see *Hall v. Secretary of HEW,* 602 F.2d 1372, 1377 (9th Cir. 1979). Indeed, in *Parker v. Harris,* supra, 626 F.2d at 233–34, "we [did] not preclude the taking of [administrative] notice [of the existence of suitable alternative jobs] in an appropriate case," citing *McLamore v. Weinberger,* supra, as an example. See also

*Phillips v. Department of HEW,* 453 F.Supp. 1047, 1051 (S.D.N.Y.1978). In *McLamore,* the particular jobs administratively noticed by the ALJ were ones listed and described in the *Job Guide* published by the state Employment Security Commission; they were, moreover, jobs that the court found to be "within the common knowledge and experience of ordinary men, [requiring] no substantiation by a vocational expert." 528 F.2d at 575.[3] In *Parker* itself, the ALJ concluded that the claimant could still perform "sedentary custodial, security or similar existent employment," 626 F.2d at 230, taking administrative notice of the existence of such jobs. We concluded that this was not an "appropriate case" for administrative notice, because "there was no 'job description clarifying the nature' and requirements of such jobs [citing *Bastien*], and no showing whatever that [the claimant] would have been able to perform such jobs." Id. at 234.

We believe that the essential concern of *Parker* is that if the Secretary chooses to proceed without expert testimony by taking administrative notice, the Secretary must provide a similar degree of specificity to achieve the underlying objectives of procedural fairness to the claimant and preservation of an adequate record for review. The key consideration in the administrative proceeding must be that the claimant be given adequate opportunity to challenge the suitability or availability of the jobs noticed.

In this case, the Secretary does not claim to rely on any directed decision of "not disabled" in the guidelines. Had the Secretary done so, we would be squarely faced with the question of the compatibility between the rules' asserted notice of existing alternative jobs and the case law requirement of specific job identification.[4] Here, however, the Secretary points to the three

---

**3.** The ALJ in *McLamore* identified "cloth examiner, spotter trainee (in the laundry industry), telephone solicitor, transit clerk in banking, machine presser and cashier" as jobs that the claimant could perform. 538 F.2d at 575.

**4.** This problem does not arise where the Secretary relies on the guidelines that mandate find-

ings of "disabled," since these guidelines do not present the same risk of unfairness to the applicant. See also Goldhammer, supra, 32 Ad.L. Rev. at 506, observing that "it is likely that claimants will be found disabled under the new regulations who would not have been found disabled under previous adjudicatory practice."

specific occupations administratively noticed by the ALJ on the basis of the report of the BDD: soldering-machine operator, tester of electronic components, and "cable worker," which is actually a typographical misprinting of "table worker." In the BDD report, reproduced at p. 293 supra, each of these jobs was accompanied by a coded numerical reference to a job description in the Department of Labor's *Dictionary of Occupational Titles.*[5] The Secretary argues that this identification of specific jobs, supported by the *Dictionary*'s descriptions of their nature and requirements, fully satisfies the Administration's burden.

While the procedure followed here may have satisfied the letter of *Parker v. Harris,* we are concerned that the method used to identify the job descriptions—the simple recitation of the titles and coded numbers in the *Dictionary of Occupational Titles* —may not have been sufficient to give the applicant fair notice of the nature and requirements of these relatively unfamiliar jobs, even assuming that he was provided access to the BDD report at or prior to the hearing before the ALJ. Without such notice Decker may have been deprived, as a practical matter, of any real opportunity to present evidence rebutting the suitability of the jobs identified. We are also concerned that the ALJ may not have exercised a sufficiently independent judgment in concluding that these jobs were suitable: his failure to correct the BDD's erroneous rendering of "table worker," for example, strongly suggests that he himself did not examine the job descriptions.[6] If this is the case, the ALJ may not adequately have performed his "affirmative duty to inquire into all the matters at issue," see 20 C.F.R. § 404.927, a duty that is not obviated by the

presence of counsel representing the applicant, see, e. g., *Coulter v. Weinberger,* 527 F.2d 224, 229 (3d Cir. 1975). We assume that in the course of any further proceedings on remand these inadequacies in the record can be corrected.

Once these problems are remedied, it may be necessary to determine whether any of the rules in the medical-vocational guidelines mandates a finding of disability at this stage. It appears that one of the rules set out earlier, rule 201.18, would have most closely fit the facts of this case at the time of the administrative hearing, if, as we have suggested, Decker's experience supports only a conclusion that he is "unskilled." At this point, however, the outcome of applying the rules is less clear: since Decker has now passed the significant threshold of age 50, he may be entitled to a finding of disability under rule 201.09 or 201.10. (If Decker were found "semi-skilled," his entitlement as a 50-year-old to a determination of disability would depend upon whether his skills were "transferable" or not; compare rules 201.10 and 201.11.) We leave for the Secretary's determination whether, on remand, the purposes of the Social Security Act and the regulations warrant application of the regulatory standards for persons between the ages of 50 and 54.

### III

Accordingly, we reverse the judgment of the district court with instructions to remand this case to the Secretary for further proceedings consistent with this opinion, including a finding as to appellant's skills (and, if necessary, their transferability), an evaluation of his employability under the Administration's regulations as a person

---

**5.** The *Dictionary*'s entries vary in detail, but they generally provide enough of a description to give a basic understanding of the nature and requirements of the jobs listed. The titles alone, however, often fail to give an accurate impression of the work involved. For example: the "soldering-machine operator" job identified in the BDD report is a relatively specialized occupation involving the soldering of type to typewriter bars; it is distinguished in the *Dictionary* from more than a dozen other soldering

jobs. Similarly, a "table worker," as identified by the *Dictionary*'s code number, is a person who "[e]xamines squares (tiles) of felt-based linoleum material passing along on conveyor and replaces missing or substandard tiles."

**6.** The *Dictionary* has no listing for "cable worker," although "cable operator," a logging job, does appear, as does "cableship worker," a maritime occupation.

limited to "sedentary" work, and a clarification of the bases of the ALJ's determination that the jobs identified by the BDD were suitable for appellant.