Claude G. BRASSARD

v.

Margaret HECKLER, Secretary of
Health and Human Services.

Civ. A. No. 84–221.

United States District Court,
D. Vermont.

Aug. 2, 1985.

Arthur P. Anderson, Saxer, Anderson &
Wolinsky, Burlington, Vt., for the plaintiff.

Donald Moroz, Asst. U.S. Atty., Burlington, Vt., for the defendant.

## OPINION AND ORDER

COFFRIN, Chief Judge.

Plaintiff seeks a review in this court, pursuant to 42 U.S.C. § 405(g), of the final decision of the Secretary of Health and Human Services (Secretary) denying Plaintiff's application for disability insurance benefits. Plaintiff moves for summary judgment; the Secretary moves for an order affirming her decision. For the reasons stated below, Plaintiff's motion is GRANTED and the Secretary's motion is DENIED. We reverse and remand to the Secretary for the calculation of benefits.

### Background

Plaintiff Brassard, a forty-nine year old applicant for disability benefits with a high school education, has a long history of epi-

lepsy and, in the recent past, has developed severe pulmonary emboli, which has resulted in his being hospitalized. In addition, Plaintiff claims that he has a visual impairment, manifested by blurred vision, double vision, restriction of visual field, and dysequilibrium in walking. Plaintiff claims that he became disabled in February, 1982. Until that time Plaintiff had been employed as a quality control supervisor at Reliance Universal Co., a Pennsylvania plant which manufactures concrete pipelines. Plaintiff's job description at Reliance included field work—crawling inside pipelines and repairing pressure leaks—operating a fork lift, and using tools.

Plaintiff's work history includes a position as clerk supervisor in a tobacco plant (1956–1963), a field person in quality control at another plant, later promoted to supervisor (1967–1981), and, finally, a quality control supervisor at Reliance Co. (July 1981–February 1982).

The Reliance plant closed on February 28, 1982, the same date on which Plaintiff claims he became disabled. Plaintiff received unemployment insurance for a one year period from the date of the plant closing until February, 1983.[1]

Although the Plaintiff admits that he was not feeling well towards the end of his job at Reliance, he claims that he continued working at the plant because he was aware it was closing in February, 1982, and he thought that he could make it until then. Plaintiff claims that after the plant shutdown he tried to find work, but that there was no work available. Specifically, he mentioned that he applied for a job at a concrete plant (Tr. 34).

In April, 1982, he began experiencing shortness of breath and loss of vision. Having had prior episodes of pulmonary emboli, Plaintiff was sufficiently familiar with the above symptoms to recognize that he required hospitalization. On May 21, 1982, he entered the Medicial Center Hospital of Vermont (Tr. 32).

At the hospital he was diagnosed and treated for epilepsy, pulmonary emboli, and concomitant visual and equilibrium disturbances.

Immediately after his discharge from the hospital, on June 1, 1982, Plaintiff received a job offer, but declined to accept it because of his poor health (Tr. 30). Since then, however, Plaintiff claims that he has applied to the A & P and several other places for lighter work (Tr. 34).

Plaintiff is heavily medicated to control his epileptic seizures as well as his pulmonary emboli. Due to his failing eyesight, he claims that, upon the recommendation of doctors, he participates only in limited activity. He does not engage in recreational activities; has only a few social contacts; and does not drive. He walks around his

---

1. The ALJ observed that the date of disability which Plaintiff reported to the hospital, April, 1982, and the date he put on his disability application, February 28, 1982, were inconsistent. Moreover, he thought that Plaintiff's claim of total incapation was not wholly credible in light of Plaintiff's attempts to find work and his acceptance of unemployment insurance. As the ALJ pointed out, in order to obtain unemployment insurance, a claimant must be "ready and willing" to work.

Although we in no way condone the practice of simultaneously receiving or attempting to receive unemployment insurance *and* disability benefits, we do not think that Plaintiff's actions in trying to obtain another job and in accepting unemployment insurance were inappropriate. Plaintiff's testimony about his work history and the development of his impairments was very credible and straightforward. It seems reasonable to us that Plaintiff, who has a solid work history, would try to obtain work after the plant shut-down. When the plant closed, he was entitled to obtain those benefits. Furthermore, he remained ready and willing to work in the spring of 1982 until he experienced the gradual onset of pulmonary emboli and visual disturbances.

We think that the evidence in the record shows that Plaintiff worked hard at his job until the plant closed and later attempted to find another job, but became increasingly disabled until he was hospitalized in May, 1982. We do not think that the discrepancy in the date of disability provided the hospital and the date he wrote on his disability application should preclude an award of benefits to Plaintiff in view of the fact that he is an otherwise deserving claimant. The problem of the discrepancy in the date of onset may be resolved by awarding him benefits as of the latter date, mid-April, 1982.

property, and is able to walk 500 yards to a nearby river. However, he claims that he is unable to walk three miles to the village center. Moreover, he contends that he can neither read nor watch TV for more than ten to fifteen minutes. After that period his eyes sting and he blinks tears away. He claims that his visual problems eliminate his peripheral vision and depth perception, make him unable to focus on objects, cause him to miss steps, cause difficulty in walking and cause him to bump into people and objects. He also has difficulties performing simple tasks, such as putting keys in key holes and screwdrivers in screws.

He claims that, as a result of his pulmonary emboli, he has chronic shortness of breath and experiences similar symptoms as those who suffer from emphysema. Activities such as walking up a hill or stairway, or going outside in cold weather, cause breathing difficulties.

Plaintiff filed an application for disability benefits which was denied by the Social Security Administration initially and on reconsideration. An ALJ examined the claim *de novo*, considering plaintiff's testimony, the testimony of doctors and ophthalmologists, the results of objective medical tests, and hospital reports. The ALJ determined that Plaintiff was not entitled to disability benefits. The Appeals Council denied Plaintiff's request for a review, thus establishing the ALJ's opinion as the final decision of the Secretary. Plaintiff then brought this civil action.

### Discussion

In a proceeding for review of the Secretary's final decision, the findings of the Secretary are conclusive where supported by substantial evidence. 42 U.S.C. § 405(g). It is not the function of a reviewing court to determine *de novo* whether the claimant is disabled, but to decide whether the Secretary's decision is supported by substantial evidence. *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir.1980); *Bastien v. Califano*, 572 F.2d 908, 912 (2d Cir.1978); *Gold v. Secretary of Health, Education and Welfare*, 463 F.2d 38 (2d Cir.1972).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). However, the district court is to consider the fact that the Social Security Act is a remedial statute to be broadly construed and liberally applied, *Bastien, supra*, at 912; *Gold, supra*, at 41; *Gero v. Heckler*, No. 83-486, slip. op. at 5 (D.Vt., Jan. 25, 1985).

The Secretary has promulgated a five-step sequence for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520, 416.-920.

First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the claimant could perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.1982).

Since the ALJ in the instant case found that Plaintiff was not currently employed,

had a severe impairment, and could not perform his past work, tr. 11, this court must proceed to the fifth step in the sequence outlined in *Berry, supra.* At this step, the burden is upon the Secretary to produce evidence to show that Plaintiff retained a residual functional capacity for work. *See* 20 C.F.R. § 404.1520. To determine Plaintiff's capacity for work, the Secretary must assess the claimant's individual capabilities and also determine whether jobs exist in the national economy which a person with the claimant's limitations could perform. 20 C.F.R. §§ 416.966–69; *Heckler v. Campbell,* 461 U.S. 458, 467, 103 S.Ct. 1952, 1957, 76 L.Ed.2d 66 (1983); *Decker v. Harris,* 647 F.2d 291, 294 (2d Cir.1981).

Normally, once it is determined that a claimant cannot perform his past work, the Secretary's application of the Medical-Vocational Guidelines ("grid"), set forth at 20 C.F.R. pt. 404, subpt. P, app. 2, is sufficient to satisfy her burden of showing that there is work in the national economy that claimant can perform. *Heckler v. Campbell, supra,* at 470, 103 S.Ct. at 1959. The grid rules are predicated on the claimant's strength or physical exertion capabilities. These rules, however, are to be applied only when they accurately describe a claimant's abilities and limitations. If a claimant suffers from "nonexertional" impairments which further limit the types of work which he can perform, the rules in the grid are not controlling and cannot be used to direct a conclusion of disabled or not disabled. *See Nicks v. Schweiker,* 696 F.2d 633, 636 (8th Cir.1983); App. 2, § 200.00(e).

In order to satisfy the burden in cases where there is a nonexertional impairment—either singly, or in combination with an exertional impairment—which further limits Plaintiff's capacity to perform work, the Secretary must produce the testimony of a vocational expert. *Haynes v. Heckler,* 716 F.2d 483, 485 (8th Cir.1983). 20 C.F.R. pt. 4, subpt. P, app. 2 § 200.00(e).

Plaintiff's impairments are both exertional and nonexertional. Pulmonary emboli is an exertional impairment which limits a claimant's strength capacity. Epilepsy and visual impairments, however, are nonexertional impairments which limit a claimant's capacity to work in other ways. 20 C.F.R. pt. 404, subpt. P, app. 2 § 200.00(e). In light of the fact that the Plaintiff has both exertional and nonexertional impairments, the parties agree that the applicable regulation in the instant case is Rule 200.-00(e)(2).

This rule requires in pertinent part that: ... where an individual has an impairment or combination of impairments resulting in both strength limitations and nonexertional limitations, the rules in this subpart are considered in determining first whether a finding of disabled may be possible based on the strength limitations alone and, if not, the rule(s) reflecting the individual's maximum residual strength capabilities, age, education, work experience *provide a framework for consideration of how much the individual's work capability is further diminished in terms of any type of jobs that would be contraindicated by the nonexertional limitation.* Also, in these combinations of nonexertional and exertional limitations which cannot be wholly determined under the rules in this Appendix 2, *full consideration must be given to all of the relevant facts in the case ...*

With this regulation in mind, we now examine the ALJ's decision to determine whether it is supported by substantial evidence.

The Secretary contends that the ALJ followed the above regulation in making his determination. In essence, she claims that the ALJ found that Plaintiff's pulmonary emboli was an exertional impairment limiting Plaintiff's strength capabilities (Tr. 11, 12) and that this exertional impairment precluded Plaintiff from performing heavy work, but not sedentary work. *Id.* Further, she argues that the ALJ's finding that "the ophthalmologic evidence indicated that the Plaintiff has no significant visual deficit," (Tr. 11), shows that the ALJ con-

sidered, but rejected, the notion that Plaintiff had any nonexertional impairment that would "further diminish" Plaintiff's work capacity. Since the ALJ found no nonexertional impairment sufficient to warrant a departure from mechanical application of the grid, the Secretary argues, the ALJ's application of the grid was proper.

■ We disagree. The ALJ's implicit finding that Plaintiff had no nonexertional impairments which would "further diminish" his capacity to work is without substantial evidence to support it. Hospital reports and the ALJ's own findings confirm that Plaintiff has severe pulmonary emboli, a significant visual impairment, and epilepsy.

Even assuming for the sake of argument that one of Plaintiff's nonexertional impairments—epilepsy—is controlled by medication, as the ALJ asserts (tr. 9, 11), we think that the ALJ's application of the grid was nevertheless improper because the record contains overwhelming evidence that Plaintiff's visual impairment, when considered together with his exertional impairment, pulmonary emboli, would further diminish his work capacity.

■ The ALJ's implicit finding that Plaintiff has no significant visual deficit is neither supported by substantial evidence nor consistent with the ALJ's other finding that Plaintiff's visual disturbances significantly impair his ability to perform basic work-related activities, such as reading for prolonged periods of time and walking without dysequilibrium.

The Secretary contends that there is "ample support" for the ALJ's finding that Plaintiff has no significant visual deficit, because, despite evidence of his loss of vision, "his acuity [the clarity of his vision,

*Stedman's* at 20] has been consistently measured near normal" (Tr. 11).[2]

We think that the ALJ has misconstrued the evidence on this point. The fact that Plaintiff's visual acuity, when corrected, has been measured near normal is unrelated to Plaintiff's visual impairment. Visual acuity measures the [sharpness, clearness and distinctness, *Id.*] of one's central vision in observing objects close to the eyes and at a distance. It has nothing to do with an impairment which restricts one's visual field—the problem for which the Plaintiff seeks treatment. A visual field impairment involves *loss* of vision. For example, tunnel vision is a visual field impairment indicating a total loss of peripheral vision. *See Stedman's,* at 530 (under "visual field"), 1566 (under "tunnel vision"). We think that the ALJ put too much weight on the fact that Plaintiff's visual acuity, when corrected, is within the normal range, and ignored the overwhelming evidence in the record of his failing eyesight and the loss of vision in his visual field.

We think that the record indicates that the Plaintiff has a significant visual impairment which causes serious problems not only with his ability to perform sight-related functions, but other physical functions as well (i.e., dysequilibrium in walking). After examining the record as a whole, especially reports of physicians who examined Plaintiff's eyes and/or conducted tests, we conclude that there is not substantial evidence supporting the ALJ's decision that Plaintiff's visual impairment is not a nonexertional impairment which further diminishes his capacity for work.

Evidence of Plaintiff's visual impairment is contained in the reports of various at-

---

**2.** In order to understand the medical evidence in the record and to obtain definitions of and relationships between medical terms, we found it necessary to resort to Stedman's Medical Dictionary. Stedman's Medical Dictionary (5th ed. 1982). Since the physicians' reports in this case are extremely technical, without reference to Stedman's, we would not have any basis for reviewing the record. We in no way claim to be medical experts. Our analysis focuses on the diagnoses rendered by the physicians, a comparison of the physicians' determinations, and the extent to which the ALJ's opinion logically follows the physicians' conclusions.

We do not substitute our judgment of Plaintiff's impairments for the judgments of the various physicians. In this regard, whenever a medical term is followed by a bracketed definition, the definition has been taken from Stedman's.

tending physicians. Several physicians specializing in neurology and ophthalmology performed objective medical tests which indicate that Plaintiff has a significant visual impairment. Dr. Aitken, a specialist in ophthalmology and neurology, conducted visual field tests which he interpreted as showing an absolute scotoma, [an isolated area within the visual field in which there is no perception of light, i.e. a blindspot, *Stedman's*, at 1266], in the central field and extending to the left side of fixation. (Tr. 150–51). Dr. Aitken thought that the results of the test also showed a left homonymous [half of retina, *Stedman's*, at 655] congruous visual field defect indicative of an occipital [back of the head, *Stedman's*, at 974] pole lesion [pathologic change in tissue, *Stedman's*, at 776]. Dr. Aitken concluded that Plaintiff ... "definitely has significant field defect ... leaving him essentially *legally blind in spite of the acuity—20/25 corrected—*as stated. This severe scotoma is absolute in this area and does not allow him any normal activity in terms of reading or work requiring vision." (Tr. 148) (emphasis added).

Dr. Joseph McSherry, a neurologist, obtained similar results. On July 19, 1983, he performed tests and also found the presence of a dense scotoma in the left field. Dr. McSherry thinks that Plaintiff's visual defect is permanent. Like Dr. Aitken, he also concluded that Plaintiff had a substantial right occipital lesion [defined *supra* ] or some smaller brain stem lesions.

Dr. Gomez, a neurologist retained by the ALJ, initially diagnosed a cranial vascular dysfunction and right parietal/occipital dysfunction. (Tr. 179). Based on an electroencephlogram (EEG), Dr. Gomez observed that Plaintiff had a minimally abnormal EEG. He also concluded that Plaintiff had a left hemianopsia [loss of vision for one half of the visual field in the left eye, *Stedman's*, at 629] and tunnel vision. In a later report, after conducting a Cat Scan, Dr. Gomez reported "visual misperception, left homonymous hemianopsia, confirmed by CT [Cat] Scan, i.e. infarct [irreversible tissue death, *Stedman's*, at 706] right occipital lobe [the right lobe of the brain in the back of the head, *Stedman's*, at 974]. Permanent problem." (Tr. 182) The Cat Scan report contained in the file states that Plaintiff has a "low density lesion in the right occipital lobe that is certainly consistent with patient's history," i.e., Plaintiff's longstanding epileptic seizure disorder and visual impairment (Tr. 185).

The Secretary contends that Dr. Gomez' report supports her view that Plaintiff's visual impairment was not grave enough to affect his capacity to perform work. This contention, however, is based only on Dr. Gomez' statement that he could not detect Plaintiff's visual field restriction by confrontation (Tr. 177–79). The Secretary's reliance on that single statement is misplaced. Although Dr. Gomez could not detect any loss in Plaintiff's visual field by examining his eyes, he did find it necessary to conduct both an EEG and a Cat Scan, the results of which indicate serious, visual impairment. Dr. Gomez' results are not inconsistent with those found by Dr. Aitken and Dr. McSherry. Both Dr. Aitken and Dr. McSherry shared Dr. Gomez' diagnosis that Plaintiff has a significant loss of vision in the left field and has an infarction [irreversible tissue death, *see supra* ] in the right occipital pole of the brain.

Dr. Peter Alden, an internist on whom the Secretary also relies to support her decision, examined the Plaintiff and concluded that he could not detect any visual field defect by confrontation. He reported that Plaintiff had questionable visual impairment and that the visual disturbance did not seem sufficiently real as to explain significant disability. We do not think Dr. Alden's opinion should be accorded much weight since he merely examined Plaintiff's eyes and conducted no objective medical tests which contradict the reports of the three above-mentioned specialists. Furthermore, unlike those physicians, he is not a specialist in neurology or ophthalmology, but rather a specialist in internal medicine and gastroenterology, i.e. disorders of the digestive system (Tr. 169).

When these reports are considered with Plaintiff's own testimony about his episodes of blurred vision, double vision, and errors in depth perception, we think that it is quite clear that the ALJ ignored a major portion of the record in making his determination of not disabled. We find that the ALJ's conclusion that Plaintiff has no serious nonexertional impairments was unsupported by substantial evidence.

■ The evidence indicates that Plaintiff's visual disturbances are constant nonexertional impairments. Where a nonexertional impairment is demonstrated, resort to the medical-vocational guidelines is inappropriate and the Secretary is required to produce a vocational expert to establish the claimant's alternate vocational capacity. *See e.g., Channel v. Heckler,* 747 F.2d 577 (10th Cir.1984); *Parsons v. Heckler,* 739 F.2d 1334, 1339 (8th Cir.1984) (Secretary may not rely on medical-vocational guidelines where claimant suffers nonexertional impairment); *Kail v. Heckler,* 722 F.2d 1496, 1498 (9th Cir.1984) (grid rules cannot be applied where nonexertional condition impairs functional capacity for work because range of jobs available is narrower than grids would indicate); *Haynes v. Heckler,* 716 F.2d 483, 485 (8th Cir.1983); *McLain v. Schweiker,* 715 F.2d 866 (4th Cir.1983) (if nonexertional impairment limits ability to do some jobs, regulations require full consideration of all relevant factors, including taking of a vocational expert's testimony); *Nettles v. Schweiker,* 714 F.2d 833, 836–37 (8th Cir.1983); *Grant v. Schweiker,* 699 F.2d 189, 192 (4th Cir. 1983); *Gagnon v. HHS,* 666 F.2d 662, 665–66 n. 6, 9 (1st Cir.1981).

After determining that Plaintiff retains the residual functional capacity to perform sedentary work, tr. 11, the ALJ, notwithstanding Plaintiff's nonexertional visual impairment, applied the grid and concluded that Rule 201.21 of Table No. 1 directs a conclusion of not disabled. Since the guidelines may not be used to direct a determination of "not disabled" where a claimant suffers from a nonexertional impairment which further restricts the types of work which a claimant can perform, the Secretary was required to obtain the testimony of a vocational expert in order to meet her burden of establishing the availability of alternative work which the Plaintiff can perform. *See Haynes v. Heckler, supra.* The Secretary's failure to do so in the instant case constitutes reversible error. *Carroll v. Secretary of Health and Human Services,* 705 F.2d 638, 644 (2d Cir.1983). We hereby reverse and remand this action to the Secretary for the calculation of benefits.

## CONCLUSION

Plaintiff's motion for summary judgment is GRANTED. Defendant's motion is DENIED.