798 F.2d 470
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Patricia C. MILLER, Plaintiff-Appellant,
v.
Margaret M. HECKLER, Secretary of Health and Human Services,
Defendant-Appellee.
 No. 85-1471.
 United States Court of Appeals,
Sixth Circuit.
 June 13, 1986.
 
 Before JONES and NELSON, Circuit Judges, and EDWARDS, Senior Circuit Judge
 PER CURIAM.
 
 
 1
 Patricia Miller appeals the district court's affirmance of the Secretary's denial of Social Security benefits. On consideration of the briefs and the record, we reverse and remand.
 
 
 2
 Claimant Patricia Miller was born in 1944. A high school graduate, she has worked as a nurse's aide and in factories. Miller testified that her medical problems began in 1979 when she began experiencing severe headaches. She claimed that since then she has felt unusually tired most of the time. In January 1979, complaining of severe weakness and pain, Miller was hospitalized for four days at the Doctor's Hospital of Montclair, California. A neurologist examined Miller and found no immediately apparent neurological disorders, although he indicated possibilities for further exploration. The diagnosis of another physician was possible collagen vascular disease, possible arthritis and labile hypertension. There is no indication in the record that these possibilities were pursued by the physicians. On discharge, Miller was in "improved" condition.
 
 
 3
 Miller moved to Michigan in April 1979. She felt that doctors had been unable to help her, so she did not again seek their advice for some time. In March 1982, Joanne Shaltz, D.O., began treating Miller. Schaltz referred Miller to neurologist Val Syring, D.O., who examined Miller in April 1992. Miller complained of headaches, weakness, continuing tiredness, incontinence, visual focusing difficulties, and sudden "giving out" of the left arm and leg. Dr. Syring ordered numerous tests because he suspected a pituitary microadenoma (tumor) and because "sela x-rays show a possible double floor."
 
 
 4
 Further x-rays revealed "generalized enlargement (ballooning) of the sella turcica." Charles Wilkerson, M.D., stated that the x-rays were "consistent with intrasellar mass lesion." Further tests were done. Miller was examined by a Computerized Tomography of the brain emphasizing the sella turcica. This "CAT" scan was negative, although the reader, Dr. Krecke, noted that it was possible that Mrs. Miller suffered from the so called empty sella." He suggested further tests.
 
 
 5
 At Butterworth Hospital, Miller underwent further tests to "rule out pituitary adenoma vs. empty sella syndrome." A CAT scan in May 1982 was of poor quality and yielded no information. The results of a July 1982 CAT scan were interpreted as being "compatible with the working diagnosis of the so called empty sella syndrome."
 
 
 6
 Miller continued to visit Dr. Syring. She complained of inexplicable fatigue, lightheadedness, weakness, irregular menstruation, difficulty in focusing visually, shortness of breath, extreme irritability, incontinence, numbness of the left extremities, and muscular pain in the extremities. Dr. Syring's impression was that Miller suffered from empty sella syndrome, obesity and depression.
 
 
 7
 The sella turcica is a small area in the cranium that ordinarily contains the hypophysis, or pituitary gland. See Stedman's Medical Dictionary, 555, 1271 (5th Law.Ed.1982). "Empty sella" is medical jargon for a condition in which the sella turcica contains no discernible pituitary gland. Id. at 1271. The condition is commonly associated with pituitary dysfunction. Id. Thus, Patricia Miller appeared to suffer from the lack of a pituitary gland and the hormones it produces.
 
 
 8
 In December 1992, Mrs. Miller again was hospitalized for an exhaustive series of tests. The urologist found a hernia of the bladder, which was causing the incontinence. The gynecologist noted amenorrhea, and exploratory surgery revealed anovulatory ovaries. Hormone medication was prescribed. More brain and blood tests were done. The final diagnosis was as follows: empty sella syndrome, muscle contraction headaches, anovulatory ovaries, fatty liver, glucose intolerance, obesity and hypertension.
 
 
 9
 Miller filed for disability benefits and supplemental security income. The disability was claimed to derive from a deteriorated pituitary gland resulting in headaches, shortness of breath, and muscular weakness. Miller also indicated vision problems, obesity and hypertension that may or may not be related to the pituitary hormone deficiency.
 
 
 10
 In April 1983, Dr. Shaltz wrote a letter to the Social Security Administration in which she explained that Miller's leg problems, strength problems and shortness of breath were caused by the empty seRa syndrome. The doctor stated that Miller could not walk more than one city block without getting short of breath. The doctor further stated that Miller's weight remained high "in spite of dieting." The doctor concluded that
 
 
 11
 Her problems are multiple and there is no definitive answer to the cause of her problem, although extensive evaluation has been done by a neurologist.
 
 
 12
 Because of her many problems I feel that Patricia C. Miller is not employable at this time.
 
 
 13
 App. at 195. In October 1983, Miller reported that Dr. Shaltz had informed her that the doctor could not predict the long-term effect of the empty sella syndrome, but had stated that it can cause many physical problems; the doctor further stated that the condition will not improve and may become worse.
 
 
 14
 After a hearing in October 1983, the ALJ denied benefits. The ALJ fou nd that, although Miller suffered from an endocrinological disorder, there were no clinical findings to demonstrate that the disorder significantly limited Miller's capacity to perform basic work activities. The ALJ stated that she could perform basic work activities because Miller testified that she sometimes was able to watch television, cook, sew, perform some household chores, and read books. The ALJ concluded that Miller's description of her symptoms was inconsistent with her description of these household activities and with physicians' observations of her ability to walk.
 
 
 15
 The Appeals Council denied review. Miller's suit for review by the district court was disposed of by summary judgment in favor of the Secretary, and Miller here appeals that judgment.
 
 
 16
 Under the Secretary's sequential analysis, the first question in determining whether a claimant is disabled is whether the person is working, and if not, the second question is whether the claimant has a "severe impairment," that is, an impairment or combination of impairments that significantly limits the ability to do basic work activities. 20 C.F.R. 53 404.1520, 416.920. The ALJ found that Miller did not have a severe impairment because her impairments did not prevent her from doing activities such as occasional cooking, sewing, watching television and reading books.
 
 
 17
 The Secretary's decision cannot be upheld for three reasons: first, the record does not support the Secretary's conclusion that there was a lack of clinical findings; second, the ALJ did not apply the proper standard for determining when an impairment is severe; and, third, the ALJ ignored the tact that the dizziness, numbness and leg collapses were claimed to be of sudden and unpredictable onset, and thus there was no contradiction in Miller's testimony regarding activities occasionally performed in her home or in physicians' reports regarding Miller's alertness or steady gait.
 
 A. Lack of Clinical Findings
 
 18
 The record is replete with clinical findings that Miller's endocrine system does not function properly: CAT scans showed no discernible pituitary gland; exploratory surgery revealed that her ovaries have stopped functioning; and her treating physician states that Miller's dieting does not result in significant weight loss. In addition, blood tests show that Miller suffers from glucose intolerance, which can cause dizziness and focal problems.
 
 
 19
 The existence of disabling headaches, fatigue, dizziness and weakness can be very difficult to p rove clinically, but here we have numerous, documented medical findings in regard to conditions that could easily cause these problems. See Sec. 404.1529 (symptoms such as pain and weakness will be considered to the extent confirmed by the existence of medically determinable condition that could be expected to produce the symptoms). Miller's treating physician, Dr. Shaltz, stated that the empty sella syndrome caused Miller's leg problems, which included weakness, numbness and sudden it giving out," and also caused her lack of strength. The doctor further stated that Miller could not walk one block without becoming short of breath, and that this problem was also caused by the endocrinological disorder. Numerous test results and findings were presented. The ALJ's conclusion that there was a lack of clinical findings is not supported by the record. If the Secretary required more test results and clinical findings in addition to those already provided, Miller should have been given a chance to provide such information. See generally Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1051-52 (6th Cir.1983) (ALJ must develop factual record fully and fairly); Decker v. Harris, 647 F.2d 291, 299 (2d Cir.1981) (ALJ has duty to inquire fully into matters at issue).
 
 
 20
 B. Whether Miller's Impairment was "Severe"
 
 
 21
 The second step in the sequential inquiry is to determine whether the impairment is severe. 20 C.F.R. Secs. 404.1520 (disability insurance), 416.920 (supplemental security income). In Farris v. Secretary, HHS, 773 F.2d 95 (6th Cir.1985), this court stated that the "severity" requirement at step two is only a minimal threshold requirement:
 
 
 22
 We therefore agree with the Eleventh Circuit's view in Brady that in order to ensure consistency with statutory disability standards, an impairment can be considered as not severe, and the application rejected at the second stage of the sequential evaluation process, only if the impairment is a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience." 724 F.2d at 920. Accord Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir.1984).
 
 
 23
 Id. at 89-90. See also Salmi v. Secretary, 774 F.2d 685, 691-92 (6th Cir.1985). When the ALJ stops at stage two and con cludes that there is no severe impairment, the issue before this court is whether "there is substantial evidence in the record supporting the ALJ's finding that [the claimant] has only a 'slight' impairment that does not affect her ability to work." Farris, 773 F.2d at 90.
 
 
 24
 The claimant here is suffering from the lack of a functioning pituitary gland. Her treating physician has stated that there are no definitive answers in regard to this type of disorder, but has stated clearly that the disorder causes the weakness, fatigue and shortness of breath, and may cause other problems. This physician has, moreover, expressed her opinion that Miller is not employable. The fact that the treating physician candidly admitted the limited knowledge presently available in regard to this disorder should not foreclose Miller's claim. Miller's complaints about her symptoms date back to 1979, and she persisted in seeking answers for her pain and functional problems in 1982 despite the fact that several physicians in 1979 had found nothing and had suggested only that she take aspirin.
 
 
 25
 We conclude that, when considered under the proper standard of Farris and Salmi, the recorid does not contain substantial evidence to show that Miner's impairment was not severe.
 
 C. Contradiction in Evidence
 
 26
 Miller's claims of severe headaches, dizziness, fatigue and numbness in the left extremities were not, as the ALJ stated, inconsistent with her description of activities such as sewing, watching television and occasionally doing household tasks. Nor are these symptoms inconsistent with physicians' observations that Miller could walk steadily and appeared alert during their examinations. Few of Miller's symptoms were claimed to be persistent at an times. In fact, Miller complained about the unpredictable nature of the weakness and numbness. It is entirely consistent that a person with intermittent spells of incapacitation could--at times--stand, walk a short distance, watch television or read books; these activities are not strenuous and there is no evidence that Miller was able to perform them for prolonged periods. It is clearly possible that such periods of incapacitation could, however, prevent a person from maintaining full-time employment outside the home. Thus Miller's testimony in regard to her symptoms and inability to work were not contradicted by her testimony in regard to performing these activities. The light household tasks and simple pleasures that Miller described could be pursued at her own pace and for as short a duration as necessary, and thus her testimony in regard to these activities does not constitute substantial evidence to support the ALJ's ultimate conclusion that this claimant can hold down a regular job.
 
 
 27
 The question of onset must also be considered. When physicians diagnose an impairment, they may estimate an onset date to the best of their ability. The onset date can go back many months prior to the diagnosis if there is sufficient medical evidence to support the estimate of onset. It may be that the empty sella syndrome and other problems commenced and reached a severe level prior to the hospitalization in January 1979. The California doctors were unable to identify her medical disorder and failed to pursue their list of possible causes. It appears that they simply were not as pe rsistent as the later team of physicians, nor did they perform as broad a range of tests. For example, they took x-rays only, and thus their impression that the sella turcica "appears normal" is not conclusive. It took more than seven doctors in Michigan, employing dozens of tests including at least four CAT scans and exploratory surgery, to identify Miller's medical problems. Miller should not be penalized because the initial medical examiners failed to discover the cause of her headaches and weakness, The record must be developed further in regard to onset.
 
 
 28
 We therefore REVERSE the district court on the grounds that the Secretary's findings of fact were not supported by substantial evidence and that the legal conclusions were erroneous. We REMAND with instructions to develop the record fully and fairly in regard to both disability and onset.