**Levi MANNS, Plaintiff,**

**v.**

**Donna E. SHALALA, Secretary of Health and Human Services, Defendant.**

**No. 93–CV–361A.**

United States District Court,
W.D. New York.

May 26, 1995.

---

Michael J. Fitzgerald, Erie County Dept. of Social Services, Legal Advocacy for the Disabled, Buffalo, NY, for plaintiff.

Patrick H. NeMoyer, U.S. Atty., Buffalo, NY (Stephan J. Baczynski, Asst. U.S. Atty., of counsel), for defendant.

## ORDER

ARCARA, District Judge.

This case was referred to Magistrate Judge Leslie G. Foschio, pursuant to 28 U.S.C. § 636(b)(1)(B), on April 28, 1994. On July 14, 1994, defendant filed a motion for judgment on the pleadings.

On February 16, 1995, Magistrate Judge Foschio filed a Report and Recommendation recommending granting defendant's motion on the pleadings.

Plaintiff filed objections to the Report and Recommendation on March 2, 1995. Oral argument on the objections was held on May 17, 1995.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon a *de novo* review of the Report and Recommendation, and after reviewing the submissions and hearing argument from the parties, the Court adopts the proposed findings of the Report and Recommendation. The Magistrate Judge's Report and Recommendation is extremely thorough and a well-reasoned analysis of the facts and law.

Accordingly, for the reasons set forth in Magistrate Judge Foschio's Report and Recommendation, defendant's motion for judgment on the pleadings is granted and the case is dismissed in its entirety.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

FOSCHIO, United States Magistrate Judge.

### JURISDICTION

This matter was referred to the undersigned for report and recommendation on April 28, 1994 by the Honorable Richard J. Arcara, pursuant to 28 U.S.C. § 636(b)(1)(B). The matter is presently before the court on Defendant's motion for judgment on the pleadings, filed July 14, 1994.

## BACKGROUND

Plaintiff, Levi Manns, seeks review of the Defendant's decision denying him Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1385 (1993). In denying Manns' application for benefits, Defendant determined that Manns had the capability to perform a broad range of sedentary to light work, excluding work involving lifting or carrying more than fifteen pounds with his left arm, standing or walking for more than six hours a day, and allowing for his inability to perform fine manipulation with his left hand, and was, therefore, not disabled as defined by the Social Security Act. (R. 19–20).[1]

On April 23, 1993, Manns filed an action seeking a determination that he was entitled to supplemental security income. Manns asserts that the Defendant's decision was not supported by substantial evidence, and that it should be reversed. On July 14, 1994, Defendant filed a motion for judgment on the pleadings, seeking dismissal of the action.

No oral argument was held on the matter.

## PROCEDURAL HISTORY

Manns initially filed for Supplemental Security Income ("SSI") on July 22, 1991. This application was denied on November 20, 1991. A request for reconsideration was filed on December 16, 1991, and the claim for benefits was again denied on March 13, 1992. Manns appealed the determination.

On October 7, 1992, a hearing was held in Buffalo, New York before an administrative law judge ("ALJ") from the Office of Hearings and Appeals of the Social Security Administration, Department of Health and Human Services, regarding the denial of supplemental security income. On October 23, 1992, the ALJ denied supplemental security income benefits to Manns. Manns then requested a review of the hearing decision. On February 24, 1993, the Appeals Council concluded that there was no basis for granting the request for review, and determined that the decision of the ALJ was the final decision of the Social Security Administration.

Thereafter, on April 23, 1993, Manns filed this action seeking review of the administrative decision. On July 14, 1994, Defendant filed a motion for judgment on the pleadings, and a related memorandum of law in support of the motion.

The matter was referred to the undersigned on April 28, 1994. No oral argument was deemed necessary.

For the reasons as set forth below, I recommend that Defendant's motion for judgment on the pleadings be GRANTED.

## FACTS

As of October 7, 1992, the date of the hearing before the ALJ, Levi Manns was forty-one years old. (R. 13, 85). Manns lived alone in a third floor apartment and did some of his own cooking, grocery shopping and cleaning. (R. 16, 35–36, 135). Manns had completed the tenth grade at Grover Cleveland High School, and had continued his schooling by taking carpentry classes at Emerson High School. (R. 36–37, 60).

From 1965 to 1966, Manns worked for the United States Corps of Engineers doing landscaping in Buffalo, New York. (R. 146). From 1968 to September of 1969, Manns worked as a flyboy for the Greater Buffalo Press. (R. 146). Manns also held a job as a laborer for Bethlehem Steel from 1969 until mid–1970. (R. 38, 146). His job consisted of moving sheets of rolled steel and other materials, pressing them and welding them together. In 1970, Manns entered the military service, however, he was discharged one month later as his reading and writing abilities were impaired. (R. 13, 37).

Manns subsequently worked for Ford Motor Company as an automation tender from August of 1970 through July of 1973. (R. 37, 123). His employment was terminated as the result of his becoming belligerent when he was confronted regarding marijuana use. (R. 237).

1. R. references refer to the page number of the administrative record submitted in this case for the court's review.

After working for Ford, Manns had jobs washing dishes for the Marriott, working as a janitor, and helping at a laundromat by opening, closing and doing some light cleaning. (R. 39, 123, 147–150). He was terminated from the Marriott because he was using drugs and could not properly perform his duties, and because his back was bothering him as the result of stacking and carrying trays of dishes. (R. 39, 273).

In 1984, Manns made his first attempt at detoxification at the Erie County Medical Center. (R. 155, 159, 165). He was admitted on June 16, 1984, however, he left after only three days of treatment. (R. 159, 165). At that time, Manns was using Dilaudid, heroin and marijuana. (R. 165). Manns was treated with repeated doses of methadone until his condition was stabilized. (R. 165). When the doctor began to reduce the levels of methadone, Manns discharged himself against medical advice. (R. 165).

On October 26, 1988, Manns was admitted to a detoxification program for heroin and cocaine dependence, again at the Erie County Medical Center. (R. 13, 154–156). At the time Manns was admitted for treatment, he was using two or three bags of heroin a day and one-half gram of cocaine every three days. (R. 155, 157, 159). Manns was taking the heroin intravenously and admitted using contaminated needles. (R. 155). Manns was discharged against his doctor's advice on October 30, 1988, and was found to be intoxicated later that day. (R. 154–156).

Manns became a client of the City of Buffalo Division of Substance Abuse Services on September 25, 1989, at which time he was taking two bags of heroin a day intravenously. (R. 176–177, 180). Manns was subsequently admitted to the Erie County Medical Center for opiate dependency on October 26, 1989. (R. 182–184). Manns was started on methadone during his hospital stay and was gradually weaned from the methadone. (R. 183). His tentative discharge was November 8, 1989, however, he was discharged on November 6, 1989 at his request. (R. 183). Manns received both group and individual counseling while in the hospital. (R. 183). Although Manns stated that he was using heroin intravenously every day, none of the

toxicology reports indicated this assertion. (R. 189).

During his stay at the hospital, Manns had a psychological assessment. (R. 192). Dr. Wilmoth F. Roberts, a clinical psychologist, believed that Manns had an adjustment disorder with anxious mood, and a dependent personality disorder. (R. 52, 192).

On October 12, 1990, an examination by Dr. Rafael C. Rondon for the City of Buffalo Division of Substance Abuse Services diagnosed mixed substance abuse. He found Manns' neck, chest, joints, extremities and neurological tests to be normal, with the exception that his muscles and reflexes were not checked. (R. 251–252).

Manns began another inpatient detoxification treatment program at Columbus Hospital, beginning on January 9, 1991 and ending on January 16, 1991. (R. 124, 198–199). His bloodwork revealed no significant abnormalities. (R. 242). However, his toxicology screen was positive for cannabinoids, cocaine and opiate metabolites. (R. 199, 207, 242). Methadone treatment was started and gradually tapered. (R. 199, 242). Manns underwent the detoxification uneventfully and was referred to the Division of Substance Abuse Services of the City of Buffalo to follow up with outpatient counseling. (R. 199, 242). His drug treatment counsellor reported that Manns was cooperative and demonstrated good insight into the nature of his chemical dependency. (R. 201). A physical examination documented that Manns retained a full range of motion in his limbs, and the doctor found his neurological status to be intact. (R. 200).

On August 21, 1991, Manns was admitted, for the fourth time, to the Erie County Medical Center Substance Intervention Unit for detoxification. (R. 221). During his withdrawal, he experienced periods of insomnia, depression and anxiety. (R. 222). Manns was treated with Methadone and Vistaril. (R. 222). His recovery was gradual and his withdrawal symptoms slowly diminished in their intensity. (R. 222). Manns' mental outlook improved and he was advised to obtain follow up counselling at the City of Buffalo Counselling Center, and given an

appointment for follow up in the Medical Clinic for the possibility of hypersensitive disease. (R. 222). No other physical problems or related complaints were noted. (R. 222). Manns was discharged on August 31, 1991. (R. 221–222).

On September 23, 1991, Dr. Won Hoon Park, a consultative psychiatrist, performed a mental status examination on Manns. (R. 237–239). Manns discussed his history of substance abuse and physical problems, including his back, left wrist, and forearm injuries. (R. 237). Dr. Park found Manns to be cooperative and attentive, and did not find any evidence of psychotic symptoms. (R. 238). However, the doctor was troubled with Manns' insight, in that Manns believed that his current drug use was not serious, so he was not motivated to stop. (R. 238). Dr. Park's diagnosis included Manns' history of drug use and his current opiate dependence, as well as documenting a possible anti-social personality disorder. (R. 238).

Manns was again admitted to Columbus Hospital for detoxification on April 14, 1992, and was released on April 22, 1992. (R. 143). This detoxification program was apparently successful as at the hearing on October 7, 1992, Manns was involved in a methadone maintenance program, and had not used heroin or cocaine for about five months. (R. 40–41, 48, 52, 58). He went to the Drug Abuse Research and Treatment Center to receive his Methadone shot at 8:30 each morning, and met with his counsellor, Mr. Moore, once a week. (R. 58).

Manns has also had several altercations with the law. He was convicted for armed robbery and third degree assault in his mid-twenties, and was incarcerated for six months. (R. 237). More recently, in August of 1991, Manns was arrested for possession of heroin. (R. 62–63). He had another arrest for possession of heroin one or two months later. (R. 63).

Manns' other medical problems began in 1974, when his left forearm and wrist were stabbed during a mugging. (R. 42, 237, 241). The laceration involved the nerves of the mid and lateral portion of the wrist. (R. 241). These injuries were repaired by Dr. Fineberg at the Buffalo General Hospital, where Manns spent seven days, and then began physical therapy. (R. 42, 241). While the tendon and nerve damage was repaired, the use of Manns' left hand was impaired. (R. 42, 237). Manns retained little strength in his left hand, and cannot lift anything weighing over fifteen pounds. (R. 42, 237). This injury was aggravated when Manns received a gunshot wound on his left index finger along with face and elbow lacerations in 1977. (R. 242). These problems were also repaired at Buffalo General Hospital. (R. 242).

Manns' back, neck and right leg were injured in a car accident in 1977. (R. 41, 237). He received treatment for these injuries at Buffalo General Hospital. (R. 41). Manns also experienced back problems since a bus accident he was involved in in 1989. (R. 43, 242). Manns asserts that this accident aggravated the injuries to his left wrist, back and leg. (R. 242). He has had trouble getting out of bed, as well as some stiffness and aching. (R. 43). He has also had pain in his legs and knees, for which he took 600 milligrams of Fenoprofen (an anti-inflammatory) twice daily. (R. 44–45). Manns stated that Dr. Allen Bernstein, who treated him after the bus accident in 1989, recommended that he use a cane to help relieve any pain in his back and legs. (R. 45–46, 243). Dr. Bernstein prescribed some medication, including Tylenol, muscle relaxants and a pain killer. (R. 46). Manns had physical therapy on his back and his hand three times a week. (R. 46).

As for Manns' neck injuries, on August 15, 1989, Manns was admitted to Buffalo General Hospital for swelling on the right side of his neck. (R. 280). His range of motion was decreased due to the swelling, which the doctors believed was the result of a deep soft tissue infection of the neck. (R. 280). Manns was started on intravenous hydration and Clindamycin, which was later changed to Nafcillin. (R. 281). These drugs are antibacterial and antibiotic agents which are intended to fight infection. Manns responded well to the Nafcillin and the swelling decreased. (R. 281). Prior to discharge, Manns could flex his neck to approximately ninety percent, and did not have any pain or tenderness. (R. 281). When Manns was

discharged on August 23, 1989, he was given a two week prescription of erythromycin (an antibiotic) and instructions to return for a follow up. (R. 281).

A Social Security disability determination was conducted by Dr. Leonard Berman in October of 1991. (R. 240–245). Manns complained of lower back pain in the lumbosacral area (relating to the vertebrae of the back and sides between the ribs and pelvis) and radiating down both legs and weakness in his left hand. (R. 241). As Manns indicated that he had taken heroin prior to the exam, Dr. Berman concluded that Manns' tremors and nervousness during the examination were a result of his taking high doses of narcotics. (R. 242–243). Manns indicated that he could only walk short distances, but had no difficulty standing or sitting for several hours at a time. (R. 243). He could also squat or climb stairs, and had little difficulty getting on and off of the examining table. (R. 243).

Dr. Berman's conclusions stated that he found Manns could bend forward at the waist to sixty degrees and lean backward to fifteen degrees with pain at the L3–L4 vertebrae. (R. 243, 292). However, Manns' lateral rotation was within normal limits and he was able to squat and get on and off of the examining table with little difficulty. (R. 243). Manns has slightly limited extension of the head and neck, as he can only rotate to forty-five degrees. (R. 243). However, he is able to reach to a one hundred and fifty degree elevation above his head, and abduction and adduction (movement of a limb towards or away from the median of the body) were within normal limits. (R. 243). Dr. Berman's examination of Manns' left hand revealed that Manns' index finger is fixed in a bent position. (R. 243). Manns also has a scar on his left wrist, where his median ulnar nerve (a nerve which runs from the forearm to the hand) was severed in 1974. (R. 243–244). However, the doctor noted that there was no atrophy (wasting of tissues from decreased function or use) of the muscles lying between or connecting the bones. (R. 243).

The straight leg raising examination revealed that with Manns' right knee bent at sixty degrees, he was able to lift his leg to one hundred and ten degrees. (R. 244). Manns' reflexes in his right leg were somewhat hypersensitive, at a rating of 4+. (R. 244). However, his abduction and adduction in both legs were good. (R. 244). The straight leg raising on the left leg with the knee extended at seventy percent allowed flexion to one hundred and ten degrees. (R. 244). Manns' reflexes in his right leg were rated at 3+. (R. 244). Dr. Berman found no atrophy or paresthesia (numbness or tingling) in either the right or left leg. (R. 244).

Dr. Berman referred Manns to Dr. Robert L. Spiegler, a radiologist, in order to determine what problems existed with Manns' left hand and his spine. (R. 240). Dr. Spiegler determined, according to the x-rays, that Manns' vertebra and accessory processes, as well as spinal disc spaces and spinal canal were normal, and the sacroiliac (vertebrae of the lower back to the pelvis) joints were intact. (R. 240). Thus, the doctor concluded that Manns had a normal lumbosacral spine. Dr. Spiegler also found a deformity with Manns' index finger, in that it is permanently fixed in a bend position. (R. 240). The doctor found the remaining bones and joints of the hand to be normal. (R. 240).

A disability interview was held on June 21, 1991 in which Manns indicated that he could only stand for twenty minutes or sit for thirty minutes before his legs and back begin to stiffen. (R. 270). However, according to the subsequent determination made by Dr. Berman in October of 1991, Manns had no difficulty standing or sitting for several hours at a time. (R. 243).

Manns also had high blood pressure. (R. 46, 142). At the time of the hearing, he was taking a one milligram tablet twice a day of Clonidine (an agent used to reduce hypersensitivity) which was prescribed by Dr. Thomas Artum on September 27, 1992. (R. 47).

### DISCUSSION

An individual is entitled to Supplemental Security Income based on a disability under the Social Security Act if the individual is unable:

> ... to engage in any substantial gainful activity by reason of any medically deter-

minable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.... An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.

42 U.S.C. § 423(d)(1)(2).

■ Once the claimant proves that he is severely impaired and is unable to perform any past relevant work, the burden shifts to the Secretary to prove that there is alternative employment in the national economy suitable to the claimant. *Parker v. Harris,* 626 F.2d 225, 231 (2d Cir.1980).

## I. *Standard and Scope of Judicial Review*

■ The standard of review for courts reviewing administrative findings regarding Supplemental Security Income, 42 U.S.C. §§ 1381–1385 (1994), is whether the administrative law judge's findings are supported by substantial evidence. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). Substantial evidence requires enough evidence that a reasonable person would "accept as adequate to support a conclusion." *Consolidated Edison Co. v. National Labor Relations Board,* 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938).

■ When the Secretary is evaluating a claim, he must consider "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability (testified to by the claimant and others), and ... educational background, age and work experience." *Dumas v. Schweiker,* 712 F.2d 1545, 1550 (2d Cir.1983) (quoting

*Miles v. Harris,* 645 F.2d 122 (2d Cir.1981)). If the opinion of the treating physician is supported by medically acceptable techniques and results from frequent examinations, and the opinion supports the administrative record, the treating physician's opinion will be given controlling weight.[2] *Schisler v. Sullivan,* 3 F.3d 563, 567 (2d Cir.1993); 20 C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d).

■ The Secretary's final determination will be affirmed, absent legal error, if it is supported by substantial evidence. *Dumas v. Schweiker, supra,* at 1550; 42 U.S.C. § 405(g) (1994); 42 U.S.C. § 1383(c)(3) (1994). "Congress has instructed us that the factual findings of the Secretary, if supported by substantial evidence, shall be conclusive." *Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

The applicable regulations set up a five step analysis that the Secretary must follow in determining eligibility for supplemental security income benefits. 20 C.F.R. §§ 404.1520, 416.920 (1994). *See Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986); *Berry v. Schweiker,* 675 F.2d 464 (2d Cir.1982). The first step is to determine whether the applicant is engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If the individual is engaged in such activity the inquiry ceases and the individual cannot be eligible for disability benefits. *Id.* The next step is to determine whether the applicant has a severe impairment which significantly limits his or her physical or mental ability to do basic work activities, as defined in the regulations. 20 C.F.R. §§ 404.1520(c), 416.920(c). Absent an impairment, the applicant is not eligible for disability benefits. *Id.* Third, if there is an impairment and the impairment, or an equivalent, is listed in Appendix 1 of the regulations, and meets the duration requirement,[3] the individual is deemed disabled, regardless of the applicant's age, education or work

---

2. The treating physician's opinion is given greater weight because of the "continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient." *Mongeur v. Heckler,* 722 F.2d 1033, 1039 n. 2 (2d Cir.1983).

3. The applicant must meet the duration requirement which mandates that the impairment must last for at least a twelve month period. 20 C.F.R. § 404.1509 (1994).

experience, 20 C.F.R. §§ 404.1520(d), 416.920(d), as, in such a case, there is a presumption that an applicant with such an impairment is unable to perform substantial gainful activity. 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1520. *See also Cosme v. Bowen*, 1986 WL 12118, at *2 (S.D.N.Y.1986); *Clemente v. Bowen*, 646 F.Supp. 1265, 1270 (S.D.N.Y.1986).

■ However, as a fourth step, if the impairment or its equivalent is not listed in Appendix 1, the Secretary must then consider the applicant's "residual functional capacity" and the demands of any past work. 20 C.F.R. §§ 404.1520(e), 416.920(e). If the applicant can still perform work he has done in the past, the applicant will be denied disability benefits. *Id.* Finally, if the applicant is unable to perform any past work, the Secretary will consider the individual's "residual functional capacity," age, education and past work experience in order to determine whether the applicant can perform any alternative employment. 20 C.F.R. §§ 404.1520(f), 416.920(f). *See also Berry v. Schweiker, supra,* at 467 (if the impairment(s) are not listed ones, claimant must show that he is without "the residual functional capacity to perform [his] past work"). If the Secretary finds that the applicant cannot perform any other work, the applicant is considered disabled and eligible for disability benefits. *Id.* The applicant bears the burden of proof as to the first four steps, while the Secretary bears the burden of proof on the final step relating to other employment. *Berry, supra,* at 467. In reviewing the administrative determination, the court must follow this five-step analysis to find if there was substantial evidence on which the Secretary based her decision. *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

### 1. *Substantial Gainful Activity*

The first inquiry is to determine whether the applicant is engaged in substantial gainful activity. "Substantial gainful activity" is defined as "work that involves doing significant and productive physical or mental duties and is done for pay or profit." 20 C.F.R. § 404.1510 (1994).

In this case, the ALJ concluded that Manns had not been engaged in substantial gainful employment since July 22, 1991, the date on which he applied for SSI benefits. (R. 13). There is no dispute that Manns has not been gainfully employed since that time.

### 2. *Severe Physical or Mental Impairment*

The next step of the analysis is to determine whether Manns had a severe physical or mental impairment significantly limiting his ability to do "basic work activities."

"Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). "Basic work activities" include:

> ... walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out, remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b)(1)(2)(3)(4)(5)(6).

Further, a physical or mental impairment is severe if it "significantly limit(s)" the applicant's physical and mental ability to do such basic work activities. 20 C.F.R. § 404.1521(a).

The ALJ concluded that Manns suffered from a combination of physical impairments which were severe, in that his ability to perform basic work-related activities was significantly limited. (R. 14–15, 19–20). The ALJ also noted that Manns had prior problems with substance abuse. (R. 13, 19). The ALJ further found that Manns' physical capacities were limited, in that Manns could not lift or carry more than fifteen pounds with his left arm, was unable to perform fine manipulations with his left hand, and could not stand for more than six hours during the course of an eight-hour workday. (R. 19). Manns alleged that he was unable to stand for more than twenty minutes or sit for more than thirty minutes before becoming weak and stiff. (R. 270). However, the ALJ believed Manns' assertions were grossly exaggerated and were not corroborated by the objective medical evidence. (R. 14–15, 17,

480

19). While Manns did suffer from back pain, both Dr. Berman and Dr. Everett indicated that Manns would have no trouble sitting or standing, and that he was also capable of squatting and bending at the pelvis. (R. 14–15, 243). Further, Manns was capable of performing various daily activities, including some light cooking and cleaning, laundry, grocery shopping, taking the bus, and attending his methadone maintenance program each morning at eight-thirty. (R. 48–52). Additionally, in October of 1991, Dr. Berman's x-ray of Manns' lumbosacral spine revealed that it was normal. (R. 14, 240, 244).

There is no question that Manns had a history of heroin and cocaine dependence. (R. 13). On several occasions he was admitted for detoxification. (R. 13–15, 17, 138, 155, 165, 183). However, at the time of the hearing Manns had his substance abuse problem under good control; he was involved in a methadone treatment program at the Drug Abuse Research and Treatment Center and had not used heroin or cocaine for five months. (R. 18–19, 41, 48, 52). He received his methadone treatment every morning at eight-thirty, and attended counselling sessions once a week. (R. 58). Although Manns has had difficulty controlling his heroin and cocaine abuse in the past, the ALJ determined that there was nothing in the record to indicate that his treatment was anything less than effective. (R. 17).

The ALJ concluded that Manns' most severe problem involved his left hand, with which Manns can only lift or carry about fifteen pounds, and he could not perform fine manipulations with it. (R. 17, 19). The ALJ then continued on to the next step, a finding of whether Manns' physical conditions were severe enough to be set forth in the Listing of Impairments at Appendix 1, 20 C.F.R. Pt. 404, Subpt. P.

**3. Listing of Impairment, Appendix 1**

The third step is to determine whether a claimant's impairment or impairments are listed in the regulations at Appendix 1 of 20 C.F.R. § 404, Subpart P. If the impair-

ments are listed in the Appendix, they are considered severe enough to prevent an individual from performing any gainful activity. 20 C.F.R. § 404.1525(a). As stated above, the ALJ determined that Manns suffered from back pain, problems with the strength and manipulation of his left hand, and past substance abuse. (R. 19–20). The ALJ, however, concluded that none of Manns' impairments were of the severity specified in the Listing of Impairments found in Appendix 1. (R. 19).

Upon review, the court finds that substantial evidence supports the ALJ's position that Manns' physical and mental difficulties did not meet the criteria in the Listing of Impairments. As to Manns' physical problems, Manns was treated for a variety of ailments, including back and leg pain, neck swelling, problems with his left wrist and hand, and high blood pressure. However, the only severe physical impairments found by the physicians who treated Manns were his inability to lift or carry more than fifteen pounds and his inability to perform fine manipulations with his left hand. The court finds there is substantial evidence to support the ALJ's finding that the impairments Manns suffers with regard to his left hand are not of the degree of severity specified in the Appendix 1 listings. 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 1.00.

Section 1.00 classifies disorders of the musculoskeletal system which have resulted in the loss of function of a major joint.[4] 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, §§ 1.00(A), (D). A loss of function may be due to a deformity, and must be "associated with relevant abnormal signs or laboratory findings." 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 1.00(A). Evaluations of musculoskeletal impairments "should be supported ... by detailed descriptions of the joints, including ranges of motion, condition of the musculature, sensory or reflex changes, ... and x-ray abnormalities." 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 1.00(A). In the present case, Manns' left hand was deformed, the joints in his index finger were perma-

4. The hand and wrist are considered together as one major joint under 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 1.00 D.

nently fixed in a bent position. (R. 240, 244). However, the phalanx (bone between two joints of the finger) appeared to be intact, although the finger itself was slightly shorter than normal. (R. 240). The remaining bones and joints of the hand were found to be normal. (R. 240, 244).

The only categories of disability which arguably pertain to Manns' injuries are Sections 1.09 and 1.13. *See* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, §§ 1.09, 1.13. However, the required level of severity of the deformity under either of these sections is not even approached on this record. Under Section 1.09, a claimant must have an amputation or anatomical deformity of both hands, both feet, or one hand and one foot. 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 1.09(A), (B), (C). As Manns has only one impaired hand, this section does not apply to his case.

■ Section 1.13 dictates that a soft tissue injury requires a series of surgical procedures within twelve months after the onset of the injury, where the major function of the extremity was not restored or expected to be restored within twelve months of the injury. 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 1.13. Although Manns did have surgery and physical therapy on his left hand and forearm after his injury, he did not have several surgical procedures and his injury was not to the extent necessary to fall within this category.

■ Insofar as the ALJ considered Manns' back pain, she correctly decided that it did not fall within Section 1.05, which discusses disorders of the spine. 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 1.05(A). A person may be found disabled under this section when "arthritis manifested by ankylosis (stiffening of a joint) or fixation of the cervical or dorsolumbar (vertabrae of the lower back) spine at 30° or more of flexion measured form the neutral position, with x-ray evidence of: (1) Calcification of the anterior or lateral ligaments [where ligaments become hardened with calcium deposits]; or (2) Bilateral ankylosis of the sacroiliac joints with abnormal apophyseal articulations [stiffening of the vertebrae of the lower back or spine with abnormal outgrowth from the bone];" 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 1.05(A). Neither Dr. Berman nor Dr. Spiegler found any evidence of arthritis manifested by stiffening of the vertebrae of the lower back. (R. 240–244). Further, the x-rays taken by Dr. Spiegler revealed a normal lumbosacral spine. (R. 240). Therefore, Manns' back problems are not so severe as to render him disabled under this section of Appendix 1.

■ There is no indication that Manns would have any serious problems with sitting or standing. Manns' swollen neck was fully treated when he was admitted to the hospital and through a subsequent prescription of erythromycin, and his high blood pressure was treated with a prescription for clonidine. Further, as to Manns' back and leg pain and difficulties in sitting and standing, the medical records presented do not indicate any diagnosis relating to these symptoms. While Manns may suffer from these reported symptoms, there is substantial evidence to support the ALJ's findings that the objective medical evidence presented at the hearing did not establish an impairment severe enough to substantiate a finding of disability. Without such an impairment, Manns is not entitled to Supplemental Security Income for a disability under Appendix 1.

As to Manns' alleged mental impairment due to his prior substance abuse, the ALJ noted that Manns was currently involved in a methadone maintenance program and had not used any illicit drugs in the past five months. (R. 16). He went to the Drug Abuse Research and Treatment Center every morning at eight-thirty to receive his Methadone injection, and once a week, he met with his counsellor, Mr. Moore. (R. 16, 58). Although Manns has had drug problems in the past, there is no indication that his current rehabilitation and support program are not under control at this time.

■ Section 12.09 classifies substance addiction disorders where either behavioral or physical changes associated with the regular use of substances that affect the central nervous system are so severe that they cause organic mental disorders, depressive syndrome, anxiety disorders, personality disor-

ders, peripheral neuropathies, liver damage, gastritis, pancreatitis, or seizures. 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.09(A)–(I). The evaluation of such disorders requires a medically determinable finding of the impairment, and consideration of the degree of limitation that the impairment has on the individual's ability to work, and whether the limitation has lasted or is expected to last for a continuous period of at least twelve months. 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.00(A). Some of the doctors who assessed Manns over the years made psychological evaluations, stating that Manns may have had an adjustment disorder with anxious mood, and a dependent personality disorder, (R. 52, 83–84, 192), as well as the possibility of hypersensitive disease or a possible anti-social personality disorder, (R. 222, 238). None of these characteristics approach the level of severity necessary for any of the criteria listed under Section 12.09 to apply.

■ Although it is obvious that Manns has had a drug problem, there is no medical evidence in the record to support a finding of disability under any of the subcategories listed under Section 12.09. 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, §§ 12.09(A)–(I). Manns argues that "chronic substance abuse can be disabling if it results in personality disorders or where claimant has lost the voluntary ability to control substance abuse." *See* Plaintiff's Memorandum of Law in Opposition to the Defendant's Motion for Judgment on the Pleadings, filed September 13, 1994, at p. 10. It is true that even if an addiction does not meet the requirements of the listings in Appendix 1, it can still be disabling if it prevents a person from engaging in substantial gainful employment. *See Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir.1981); *Wolf v. Secretary of Health and Human Services*, 612 F.Supp. 289, 291 (W.D.N.Y.1985). However, before a showing of disability based on a drug or alcohol addiction can be made, it must first be shown that the claimant is addicted, and does not have the ability to control his use voluntarily. *Ferguson, supra,* at 248–249.

■ In the case at bar, the ALJ found that Manns had problems with substance abuse. (R. 19). Manns underwent several detoxification treatments at various substance abuse centers, however, he successfully completed a treatment program at Columbus Hospital on April 22, 1992, (R. 143), and has consistently followed his Methadone maintenance treatment program at the Drug Abuse Research and Treatment Center for over five months before his hearing. (R. 40–41, 48, 52, 58). Therefore, as the record supports a finding that Manns has the ability to control his substance abuse problem, and has continued to do so for several months, the ALJ properly concluded that Manns' history of substance abuse did not amount to a disability preventing Manns from engaging in substantial gainful employment.

In summary, the ALJ found that Manns' physical and mental impairments, or any equivalents, were not so severe as to be encompassed by the Listing of Impairments as identified in Appendix 1 of the federal regulations. (R. 19). The court finds that substantial evidence in the record supports this determination.

### 4. *"Residual Functional Capacity" to Perform Past Work*

The fourth inquiry in the five-step analysis is whether the applicant has the "residual functional capacity" to perform past relevant work. "Residual functional capacity" is defined as the capability to perform work comparable to the applicant's past substantial gainful activity. *Cosme, supra,* at *3.

The ALJ found, however, that Manns did not have any relevant past work experience. (R. 19). This evidence is undisputed, and accordingly, the court finds that the determination is supported by substantial evidence.

### 5. *Suitable Alternative Employment in the National Economy*

As the ALJ concluded that Manns did not have any past relevant work, the ALJ went on to make a determination as to whether there was any position within the national economy for which Manns would be qualified or suitable.

■ In order to make such a determination, first, the Secretary must show that the applicant's impairment is such that it

permits certain basic work activities essential for other employment opportunities. *Decker v. Harris*, 647 F.2d 291, 294 (2d Cir.1981). The Secretary must prove by substantial evidence the applicant's "residual functional capacity" with regard to the applicant's strength and "exertional capabilities." *Decker, supra*, at 294. An individual's exertional capability refers to the performance of "sedentary", "light", "medium", "heavy", and "very heavy" work.[5] *Decker, supra*, at 294.

■ In addition, the Secretary must prove that the claimant's skills are transferrable to the new employment, if the claimant was employed in a "semi-skilled" or "skilled" job.[6] *Decker, supra*, at 294. This element is particularly important in determining the second prong of the test, *whether suitable employment exists in the national economy.*

In this case, the ALJ determined that Manns had the residual functional capacity to perform the "physical exertional and nonexertional requirements of [sedentary] work except for his exertional inability to lift or carry more than fifteen pounds with his left arm or to stand or walk for more than six hours during the course of an eight-hour workday, and his nonexertional inability to perform fine manipulation with his left hand." (R. 19–20). The ALJ noted that Manns did not have any acquired work skills which would be transferable to the skilled or semi-skilled work functions. (R. 20).

■ In the second prong of the analysis, the Secretary must evidence the existence of particular jobs available in the national economy practical for an individual limited to the applicant's abilities and transferable work skills. *Decker, supra*, at 296. Therefore, the ALJ was required to show substantial evidence that there was alternative employment for Manns in the national economy.

The Medical Vocational Guidelines (the "grids") are often used to determine whether alternative employment exists in the national economy. *Decker, supra*, at 296; *Bapp v. Bowen, supra*, at 604. The grids combine several factors including education, work experience and age to determine whether a finding of "disabled" or "not disabled" should be rendered. *Decker, supra*, at 296; *Bapp, supra*, at 604.

■ In this case, Manns has both exertional and nonexertional impairments; including his inability to lift or carry more than fifteen pounds with his left arm, and his inability to perform fine manipulations with his left hand, respectively. Even when there is a nonexertional impairment, it is permissible for the ALJ to resort to the grids, provided that the ALJ finds, and the record supports the finding, that the nonexertional impairment does not significantly diminish [7] the

---

5. "Sedentary work" is defined as: "lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools ... Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

6. The regulations define three categories of work experience: "unskilled", "semi-skilled", and "skilled". *Decker, supra*, at 295.

"Unskilled" is defined as: "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength ... primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in thirty days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs." 20 C.F.R. § 404.1568(a).

"Semi-skilled work" is defined as: "work which needs some skill but does not require doing the more complex work duties. Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work. A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks." 20 C.F.R. § 404.1568(b).

7. "Significantly diminish" means "additional loss of work capacity beyond a negligible one, or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Bapp v. Bowen, supra*, at 606.

claimant's residual functional capacity to perform the full range of activities listed in the grids. *Thompson v. Bowen*, 850 F.2d 346, 349–350 (8th Cir.1988). However, where the claimant's nonexertional impairments do significantly diminish his capacity to perform the full range of activities listed in the grids, the Secretary must produce expert vocational testimony or other similar evidence to establish that there are jobs available in the national economy for a person with claimant's characteristics. *Harris v. Shalala*, 45 F.3d 1190, 1194 (8th Cir.1995) (citing *Thompson, supra*, at 349); *Bapp v. Bowen, supra*, at 605; 20 C.F.R.Pt. 404, Subpt. P, Appendix 2, § 200.00(e)(2). Where a claimant's work capacity is significantly diminished beyond that caused by his exertional impairments, the grids will not accurately determine disability status as they fail to take into account claimant's nonexertional limitations. *Bapp v. Bowen, supra*, at 605. The Second Circuit has held that when a claimant's nonexertional impairments significantly diminish his ability to work, over and above any incapacity caused solely by exertional limitations, so that the claimant is unable to perform the full range of employment indicated by the grids, the Secretary must introduce the testimony of a vocational expert that jobs exist in the economy that the claimant can obtain and perform. *Bapp v. Bowen, supra*, at 603.

█ In the present case, the ALJ gave full consideration to all of the relevant facts, including the testimony of Mr. Alan Winship, a vocational expert. (R. 12–20). The ALJ found Manns to be a "younger" person, between the ages of eighteen and forty-four, with a tenth grade education and limited ability to read and write. (R. 20); 20 C.F.R. § 416.963; 20 C.F.R. § 416.964. Thus, based on his age, education, work experience and exertional limitations, Manns would be considered capable of performing sedentary work, and would be considered "not disabled" based on the grids. *See* 20 C.F.R. Pt. 404, Subpt. P, Appendix 2, §§ 201.23, 201.24 (1994). However, the ALJ continued her analysis of Manns' situation by stating that his additional nonexertional impairment would prevent him from performing the full range of activities in the sedentary category. (R. 20). The ALJ then considered the expert testimony of Mr. Winship, who testified that a person of Manns' age, with a limited ability to read or write, who can stand or walk for up to six hours a day, lift up to fifteen pounds and use his left hand in only a limited fashion, and who is right hand dominant, could find work as a film touch-up screener, a production inspector, a sorter, or an electron tube assembler. (R. 18, 70–78). There was substantial evidence in the record to support the assumptions upon which Winship based his opinions. (R. 33–70). Consequently, the expert's opinion that Manns could perform such sedentary jobs as a film touch-up screener, a production inspector, a sorter or an electron tube assembler with his exertional and nonexertional limitations, and that there were approximately 414,000 of these jobs available in the national economy satisfied the Secretary's burden of showing the existence of alternative substantial gainful activity suited to Manns' physical and vocational capabilities. Winship also testified that such sedentary jobs would be available in afternoon shifts so as to accommodate Manns' morning Methadone treatment needs. (R. 79).

Therefore, in this case, there is substantial evidence in the record supporting the ALJ's conclusion that Manns' can perform substantial gainful activity despite his limitations. Since the ALJ determined that Manns would be able to be employed in positions such as a film screener, tube assembler, or sorter, the ALJ found Manns not to be disabled. (R. 20). The court agrees. The court finds that the relevant circumstances indicate that Manns can obtain an unskilled sedentary position, in the national economy, and, therefore, he is not entitled to Supplemental Security Income benefits.

Accordingly, there is substantial evidence in the record to support the ALJ's finding that Manns is not disabled within the meaning of the law.

### CONCLUSION

Based on the foregoing analysis, I recommend that Defendant's motion for judgment on the pleadings be GRANTED.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

ORDERED that this Report and Recommendation be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 30(a).

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

SO ORDERED.

DATED: February 16th, 1995